Madden, Judge,
delivered the opinion of the court:
The plaintiff sues to recover income and excess profits taxes paid by it for the years 1941 to 1946. It says that, *235 pursuant to section 124(d) of tbe Internal Revenue Code of 1939, 26 U.S.C. (1952 ed.) § 124(d), which section was enacted in 1942, 56 Stat. 849, it became entitled to certain amortization deductions with respect to certain of its emergency facilities; that these deductions entitled it to refunds of the taxes it had paid; and that it has filed proper claims for the refunds, which claims had been denied. It says that the Government’s rejection of its claims is based on a set-off claimed by the Government on the ground that the plaintiff’s excess profit credit for the years in question was too large because it had overstated the amount of its “equity invested capital,” that is, the value of the property and money paid to the plaintiff in the year 1902, the year the plaintiff corporation was formed, in exchange for the plaintiff’s stock then issued.
The parties are agreed that once the then market value of the preferred and common stock issued by the plaintiff on July 23, 1902 to acquire six existing corporations and $500,000 in cash is determined, this value will determine the plaintiff’s original equity invested capital[1] for the purposes of World War II excess profits taxes for 1941-1946, and that all adjustments since 1902 can be agreed upon and the amount of the plaintiff’s recovery, if any, will be computed in further proceedings under Rule 38(c).
If it might appear from the foregoing recital that what is left for decision is relatively simple and easy of determination, the appearance would be deceptive.
The plaintiff on July 23, 1902 issued 155,000 shares of its preferred stock, with a par value of $15,500,000, and 150,000 shares of its common stock with a par value of $15,000,000, and received in exchange for the stock, $500,000 in cash, all the assets of one company and all the capital stock of five other companies. The plaintiff dissolved the five other companies and acquired their assets on August 1,1902.
The plaintiff does not contend that the assets paid in to it for its stock were worth the par value of the stock, $30,500,000. It does contend that they were worth $18,-500,000. The Government contends that they were not *236 worth more than $15,000,000. The commissioner of this court found that they were worth approximately $17,000,000. The evidence presented to him concerned, to a large extent, events and situations almost sixty years in the past.
The value of the stock of the six constituent companies which were merged to form the plaintiff company in 1902 would have been most helpful. There was no evidence of it. The market price of the plaintiff’s stock in extensive trading immediately after the plaintiff company was formed would have been helpful. The stock was not listed for trading for several months after it was issued, and in the meantime the stock market in general had suffered a severe set-back, and such trading as there was in the plaintiff’s shares soon after they were listed was so small as to be insignificant.
The plaintiff presented several different kinds of evidence to show 1902 values. There was a contemporary statement of the new corporation’s earning prospects, prepared by reputable accountants. It was based upon the earnings, during the period just before the merger, of the constituent companies, as constructed by the accountants, eliminating or adjusting losses due to strikes or other non-recurring events. Taking these constructed earnings and applying a suitable price-earnings ratio, the plaintiff’s experts at the trial arrived at a figure of about $18,500,000. The parties agree that four other named companies which were already in business in 1902 were the ones most comparable to the plaintiff. It was possible to ascertain their earnings, and the market price of their stock, as of 1902. Those figures were used to determine a proper price-earnings ratio for application to the plaintiff.
The commissioner has found, and we agree, that the price-earnings computation, properly adjusted, produces a figure of approximately $17,000,000.
It was also possible to determine the relation of book-value of assets and market price of stock of the four comparable companies, and to apply that to the plaintiff’s then book value, which is known. This process produced a figure of $18,510,450.
There was trading in fractional shares of the plaintiff. The price was pegged; nevertheless the shares were bought *237 and sold quite extensively. Those transactions, properly adjusted, produce a figure of $18,558,750.
In 1907 a special committee of directors of the plaintiff was set up to devise a plan to reduce the capitalization of the plaintiff to a figure not exceeding the net value of its assets. Judge Elbert H. Gary, a director of the plaintiff, who was also, at the time, the Chairman of the Board of the United States Steel Corporation was chairman of the committee. The committee, in January 1908, after an extensive study, reported an equity capitalization of $17,184,000 as of July 31, 1907, and the plaintiff’s capital structure was readjusted accordingly. The committee’s determination of the value as of 1907 was equivalent to a determination that the plaintiff’s original equity invested capital, on July 23, 1902, had been $18,481,887.75.
The Government’s Internal Bevenue officials, in 1920, in connection with the excess profits tax of the First World War, reviewed the plaintiff’s returns for several years before 1920 and approved the plaintiff’s figure for its equity invested capital, which figure was practically the same as the one it now contends for. Again for the years 1940 through 1944, no objection was made to the plaintiff’s figure, until as we have seen, the plaintiff filed its claim for refund of taxes on a wholly unrelated ground. Only then did the Government raise, by way of offset, the question of the 1902 valuation.
The Government bases its contention for a lower valuation than that found by the trial commissioner of this court upon the price at which the plaintiff’s shares were first sold, when they became available for sale. On November 22, 1902, 100 shares of the preferred stock were sold over the counter. There were, as we have seen, 155,000 shares of preferred stock outstanding. On December 5, 1902, 57 shares of the plaintiff’s common stock were sold on the stock exchange. There were 150,000 such shares outstanding. We have concluded that these sales, relatively insignificant in amount, do not prove much about the market value of the stock in July when it was issued. The reasons for this conclusion are given in Finding 48.
*238 Findings of Fact
Tlie problem presented by this case is a purely factual one. Many of the trial commissioner’s findings, which we have adopted, are his reasoned inferences from facts in evidence. We agree with those inferences and do not repeat the reasoning in this opinion. Our conclusion is that $17,000,000 is as fair an approximation of the 1902 value of the plaintiff’s then invested capital as it is practicable to arrive at.
The plaintiff is entitled to recover and judgment will be entered to that effect. The amount of recovery will be determined pursuant to Rule 38 (c).
It is so ordered.
Need, Justice {Bet.), sitting by designation; Durfee, Judge; Laramore, Judge; and Jones, Chief Judge, concur.
FINDINGS OE FACT
The Court having considered the evidence, the report of Trial Commissioner Robert K. McConnaughey, and the briefs and argument of counsel, makes findings of fact as follows:
1. Plaintiff, American Steel Foundries, was incorporated in New Jersey, June 26,1902. Its original authorized capital was 200,000 shares of common stock and 200,000 shares of preferred, each having a par value of $100 a share.
TIIE ISSUE FOR DECISION
2. Plaintiff seeks to recover alleged overpayments of excess profits taxes under World War II excess profits tax provisions of the Internal Revenue Code of 1939 for the nine months, January 1,1941, to September 30,1941, and for fiscal years ending September 30 of each year from 1942 through 1946, inclusive. These periods are identified hereafter in these findings by reference to the year in which the period referred to ended.
3. The only issue now to be decided is the amount of plaintiff’s original equity invested capital paid in on July 23, 1902, when plaintiff acquired six existing corporations and $500,000 cash in exchange for 155,000 shares of its preferred stock and 150,000 shares of its common.
The parties have stipulated that, once the amount of plaintiff’s original equity invested capital is determined, subse *239 quent adjustments that must be made to determine its equity invested capital for 1941-1946 and to compute the amount of recovery and offsets, if any, may be determined in further proceedings under Eule 38 (c).
ADMINISTRATIVE HISTORY OE PLAINTIEE’s CLAIM
4. Plaintiff filed its income and excess profits tax returns for 1941-1946 with the Collector of Internal Eevenue for the First District of Illinois and paid the taxes and interest shown to be due thereon. In computing its excess profits tax, plaintiff used the excess profits credit based on invested capital.
5. On examination of plaintiff’s returns for 1940-1941 the Internal Eevenue Service initially determined that plaintiff’s net equity invested capital as of July 31, 1907, was $17,184,000.
Making allowance for capital additions of $1,702,800, earnings of $1,250,561.93 and capital distributions of $4,251,249.68, agreed to by the parties, this reflects a net original equity invested capital of $18,481,887.75 as of July 23, 1902. Plaintiff’s returns for 1942, 1943 and 1944 were also examined and initially were disposed of on the same basis as the 1940-1941 return. The record contains no evidence that these initial dispositions of the returns for the years 1940 through 1944 were preceded by any independent valuation.[1]
6. On December 3, 1945, pursuant to Section 124(d) of the Internal Eevenue Code of 1939, plaintiff filed elections to terminate the amortization period with respect to certain emergency facilities and on December 19, 1945, filed timely claims for refmid for 1941-1944 based on increased amortization deductions for those years. The amount of the increased amortization deductions claimed by the plaintiff is not in dispute. The Commissioner of Internal Eevenue conceded their correctness, and substantial refunds based upon them *240 were approved by tire examining agent and the Internal Kevenue Agent in Charge.
7. Thereupon the Internal Kevenue Service reexamined plaintiff’s returns for 1941 through 1944 and reduced its determination of plaintiff’s original equity invested capital by an amount adequate to increase plaintiff’s net liability for income and excess profits taxes for 1941-1944 sufficiently to offset the refunds based on increased amortization deductions that otherwise would be due plaintiff. Consistent with that determination for 1941-1944, the Commissioner similarly reduced plaintiff’s equity invested capital for the years 1945-1946.
8. The last determination of plaintiff’s original equity paid in capital by the Internal Kevenue Service that is pertinent here was made by report dated July 2, 1952. It allowed plaintiff an equity invested capital as of July 1902 of $12,675,000. This figure was arrived at by multiplying the number of plaintiff’s shares by the average prices at which such shares were traded on the New York Stock Exchange for the week ended December 5,1902, over four months after the valuation date.
9. Deficiencies were asserted against plaintiff for 1942-1946 and were collected with interest on December 5, 1952, by credits allowed plaintiff for various over assessments and interest thereon.
10. Plaintiff filed timely claims for refund for 1942-1946 based on the ground that it was entitled to have included in its equity invested capital for each year the amounts set out in its return, computed as follows:
Money and property paid in 1902,1903 and 1905_ $21,551,431.19
Less capital distributions_ 4, 251,249. 68
$17,300,181. 51
Plus accumulated earnings and profits to July 31,
1907- $1,250,561. 93
Invested capital computed to July 31,1907_[2] $18,550,743. 44
*241 11. Plaintiff’s claim for refund for 1941 based on increased amortization and filed on December 19, 1945, was not allowed because of adjustments resulting from the reduction of its equity invested capital. Plaintiff’s claim contesting these adjustments was denied November 6, 1952. This suit was commenced within two years of such denial and is timely with respect to that claim as it is with respect to plaintiff’s claims for 1942-1946, no action having been taken by the Commissioner of Internal Eevenue within six months of the filing of such claims.
FORMATION OF AMERICAN STEEL FOUNDRIES
12. On July 23, 1902, plaintiff issued 155,000 shares of its preferred stock with an aggregate par value of $15,500,000 and 150,000 shares of its common stock with a par value of $15,000,000 in exchange for—
(a) $500,000 in cash;
(b) All the assets of Eeliance Steel Castings Co.;
(c) All the stock of the following corporations:
American Steel Foundry Company
Leighton & Howard Steel Company
American Steel Castings Company
Franklin Steel Castings Company
The Sargent Company
The assets of the five companies last named were taken into American Steel Foundries on August 1, 1902.
13. The combination of these six companies, which are briefly described immediately below, made the plaintiff one of the Nation’s largest producers of steel castings for the railroad industry.
(a) Reliance Steel Castings Company was organized in 1889 and made a wide variety of steel castings. Its plant was at Pittsburgh, Pennsylvania.
(b) American Steel Foundry Compamj was organized in 1894 and made complete freight car structures and bolsters and couplers for railway freight cars. Its plant was at Granite City, Illinois.
(c) Leighton <& Howard Steel Company was organized in 1881 and made primarily cast steel side frames, bolsters, and couplers for freight cars. Its plant was at East St. Louis, Illinois.
*242 (d) American Steel Castings Company, largest of the six, was organized in 1893. It made steel castings for ships and railway cars, including couplers, draw bars, and bolsters for railway cars. It had plants at Chester, Pennsylvania, Alliance, Ohio, and Sharon, Pennsylvania.
(e) Franklin Steel Castings Company was organized in 1895 and made steel castings. Its plant was in Franklin, Pennsylvania.
(f) The Sargent Company was organized in 1878 and made primarily wheels, bolsters, steel gears, and knuckles for freight cars at its plant in Chicago, Illinois.
14. The balance sheet of American Steel Foundries as of July 31,1902, based on the par value of the securities issued and corrected to eliminate an overstatement of cash and an understatement of real estate, was as follows:
ASSETS
Real estate, buildings, plant, machinery and other permanent investments_$28, 294, 613. 42
Merchandise, materials and supplies on hand_ 1, 494,485. 73
Accounts and bills receivable_ 1,500, 841.56
Miscellaneous investments_ 35, 673. 69
Real estate not used for business purposes_ 310, 365. 36
Cash and cash assets_ 824, 743. 08
Total_$32, 460, 722.84
LIABILITIES
Current liabilities. $1,489,722.84
Bonds payable_ 471,000. 00
Capital stock_ 30, 500,000. 00
Total_$32, 460, 722. 84
As of July 31, 1902, the total book net worth of the six constituent companies, including the $500,000 acquired in cash, was $10,600,584.02.
TRADING IN PLAINTIFE’s STOCK IN 1902
15. Plaintiff’s stock was first listed on the New York Stock Exchange, November 22, 1902. The preferred was first traded December 2, 1902; the common December 5, 1902. The following table shows the transactions in plaintiff’s stock on the New York Stock Exchange during December 1902:

*243

16. The ground principally urged by defendant for valuation of plaintiff’s original equity invested capital is based upon the average price of 14% paid for plaintiff’s common stock on the New York Stock Exchange during the week ended December 5, 1902, and upon a first sale of 100 shares of plaintiff’s preferred over the counter on November 22, 1902, at 74%. The average price of plaintiff’s preferred on the New York Stock Exchange during the week of December 5,1902, was 67%.
The 57 shares of plaintiff’s common stock traded on December 5, 1902, amounts to less than 4 one-hundredths of one percent (.0004) of the 150,000 shares outstanding and was the only common traded that week. During the same week 400 shares, or a little over % of one percent (.0025) of the outstanding 155,000 preferred shares were traded. A total of 7,034 shares of plaintiff’s preferred and 7,855 shares of its common was traded during the period from December 1902 to April 3,1903. This represents somewhat less than five percent of plaintiff’s outstanding preferred and common stock.
In July 1902 business and industrial and railroad stock prices were increasing. In October, November and Decern- *244 ber 1902 railroad and industrial stock prices declined severely and in December reached a point then described as near panic.
17. The organization of American Steel Foundries resulted in the issuance of fractional shares of its stock. Shearson, Hammill & Co., New York brokers handling the exchange of stock, were authorized to purchase and sell such fractional shares at fixed rates of $85 per full share for the preferred and $30 per full share for the common stock. These were pegged prices. Fractional shares were traded at these prices from November 4,1902, to February 1904.
AMERICAN STEEL FOUNDRIES’ ESTIMATED EARNINGS PROSPECTS
18. As of July 23, 1902, the plaintiff had no record of earnings as a composite enterprise. During 1902 the accounting firm of Jones, Caesar & Co., American agents for Price, Waterhouse and Company, then an English accounting firm, examined the accounts of the six companies combined to form American Steel Foundries and submitted to plaintiff earnings reports dated August 29,1902, and November 1, 1902, based on the earnings of the six component companies. In each of these reports the combined annual earnings rate of the six companies was stated to be $1,889,800. A statement of earnings of the constituent companies at the annual rate of $1,889,800, certified to by the accountants, was attached as an exhibit to the New York Stock Exchange listing application for the plaintiff’s stock. This figure of $1,889,800 was also published as plaintiff’s annual rate of earnings in Moody’s Manual of Corf oration Securities for 1903, a publication relied upon in financial circles.
19. The earnings reports described in finding 18 were issued from the New York office of Jones, Caesar & Co. Mr. George O. May and Mr. B. E. Seatree worked on the accounts of American Steel Foundries in the New York office of Jones, Caesar & Co. in 1902. Mr. May was a partner in Jones, Caesar & Co. during 1902. In 1911 he became senior partner of the firm, which by then had become Price, Water-house and Company. He served in that position until 1940. In the course of his career, Mr. May acquired an outstanding international reputation in the accounting field. Mr. Seatree *245 became a partner of Price, Waterhouse and Company in 1906 and likewise established, in due course, an outstanding reputation in the accounting field. Mr. Arthur L. Dickinson was the senior partner in charge of the New York office of Jones, Caesar & Co. in 1902. According to the record, he would have been universally recognized as the leading accountant in the United States in 1902. It is Mr. May’s recollection that he and Mr. Seatree worked on a statement based on the accounts of American Steel Foundries and that he probably prepared the first drafts of the earnings reports referred to in finding 18.
20. In preparing its reports of plaintiff’s earnings, the accountants annualized actual earnings figures for less than a year for several of the component companies, eliminated some non-recurring loss items, and relied upon their own opinions as experts in including allowances for estimated income and expenses where exact figures were not available. They did not reduce the annualized figures in anticipation of any possibility of losses from shut-downs or other impediments to continuance of earnings at the rates shown by the figures available. The adjustments of actual figures made by the accountants in preparing the reports which are evident from this record are the following:
The accountants started with a figure of total earnings of $1,625,000, made up of—
(a) actual earnings of American Steel Castings Company for a 357-day period ended April 22, 1902, annualized;
(b) actual annual earnings of Franklin Steel Castings Company for the year ended December 31, 1901;
(c) actual earnings of Alliance Steel Castings Company for the six-month period ended December 31,1901, annualized;
(d) actual earnings of American Steel Foundry Company for the nine-month period ended April 30, 1902, annualized; and
(e) actual earnings of Leighton & Howard Steel Company for the eight-month period ended March 31, 1902, annualized.
To the total of $1,625,000 so derived, they added the following amounts, totaling $264,800—
*246 (f) $66,800 as estimated earnings of the Sargent Company;
(g) $150,000 to compensate for losses due to strikes in American Steel Castings Company that were deemed non-recurring;
(h) $48,000 to adjust annualized earnings of American Steel Foundry Company to compensate, on an annualized basis, for $36,000 of estimated nine-month losses from temporary closing of its plant for part of January during the nine-month period for which actual figures were used.[3]
Thus losses that did occur and were deemed non-recurring were eliminated by restoring to the earnings ample amounts to compensate for such losses. Moreover, in annualizing the recorded earnings for less than annual periods during which no strikes or other shut-downs had occurred, no adjustments were made to reflect any possibility that any other losses from seasonal influences, strikes or other hazards might affect yearly earnings adversely over a more extended period.
plaintiff’s OPERATIONS BETWEEN 1902 AND 1907
21. After the six companies were joined in American Steel Foundries, their plants continued to produce the same products they had produced before. Plaintiff’s principal customers were the railroads, and it sold components for freight cars to most of the major railroads in the United States.
22. During its first full year of operation, plaintiff’s earnings were $1,538,703.21, about 19 percent less than the $1,889,800 of estimated annual earnings reported by Jones, Caesar & Co. when the plaintiff was first organized. However, the first full year of operation extended into the 1903 depression.
23. Plaintiff acquired the American Steel Bolster Company in June 1903 and Simplex Bailway Appliance Company in February 1905. The aggregate value of the property paid in in these two acquisitions was $1,702,800.
*247 24. Between July 23, 1902, and July 31, 1907, plaintiff’s capital distributions were as follows:
Cash distributed in Simplex acquisition_ $109,311.19
Cash distributed in acquiring treasury stock- 189, 618.49
Bonds distributed in 1907 recapitalization- 3,436, 800. 00
Cash distributed in 1907 recapitalization_ 515,520.00
Total capital distributions_$4,251,249. 68
25. Between July 23, 1902, and July 31, 1907, plaintiff’s total accumulated earnings and profits were $1,250,561.93.
THE 1907 RECAPITALIZATION
26. Up to 1907 no dividends bad been paid on plaintiff’s common stock, and a large amount of dividends bad accumulated unpaid on the preferred. Some of the stockholders were urging the management to pay dividends. At that time wide publicity was being given to pending law suits seeking to impose personal liability on directors of other companies that had paid dividends on capital stock, the total par value of which exceeded net asset value. Plaintiff’s management was unwilling to declare dividends until its outstanding capital was reduced to an amount no greater than the actual net value of its tangible and intangible assets.
27. In November 1907 a special committee of directors was appointed to develop a plan of recapitalization designed to accomplish a reduction of plaintiff’s capital stock to a figure not exceeding the net value of its assets. In December 1907, Judge Elbert H. Gary, a director of plaintiff, was appointed chairman of the recapitalization committee. Judge Gary was chairman of the United States Steel Corporation and of other companies. He had the highest reputation for integrity and business judgment and was held in high esteem in the business world. He held large interests, approximately equal in amount, in both common and preferred stock of the plaintiff, and his personal interest was not substantially affected by whether holders of one class or the other might receive preference under any plan developed by the committee. The membership of the committee generally, however, represented divergent interests. Some were holders of preferred stock; others were holders of common.
*248 28. The special committee carried out its work through November and December 1907 and reported a recapitalization plan to the directors on J anuary 3,1908. The plan was later submitted to the stockholders and was approved by them on June 12,1908, to become effective retroactively as of July 31, 1907.
29. During the period between November 1907 and January 1908 when the recapitalization committee was preparing the plan of reorganization, a severe business and stock market decline was just coming to an end. During December 1907 and the early part of 1908 stock market prices were rising.
30. On July 31, 1907, the date when the plan became effective, and the date as of which, presumably, the committee’s valuation was made, the stock market was about half way through a precipitous decline that ended in December of that year; and a decline in general business conditions, which steepened sharply in the latter part of 1907, was just beginning after several years of relative stability.
31. The recapitalization plan proposed by the committee included provision for exchange of all outstanding preferred and common stock of the plaintiff for 171,840 shares of common stock, having a par value of $100 per share; a total equity capitalization of $17,184,000. In reporting to plaintiff’s stockholders on the recapitalization plan on March 14,
1908, Judge Gary made the following statement:
* * * the only practicable plan, as it seemed to the Board of Directors which would bé fair and reasonable to the stockholders, and which would be desired by them, was to reduce the capital stock so as to make it substantially on a parity with the present actual value of the property.
GENERAL BUSINESS CONDITIONS IN 1902 AND IN 19 07
32. In July 1902, when plaintiff was organized, general business in the United States was prosperous and had been prosperous for some eighteen months. Industrial stocks were stable and, according to indicators then deemed significant, the economy of the United States generally was trending upward. The Cleveland Trust Company Index of Business Activity was increasing as were pig iron production, *249 output of steel ingots and castings, total manufacturing production, railroad freight ton-miles, factory employment, and wholesale prices.
33. Because the railroads were the principal users of plaintiff’s products, the value of its enterprise was affected by the condition and prospects of the railroads. In July 1902 the business of the railroads was increasing and its expansion was reflected in increases in the value of railroad stock.
34. Throughout the latter half of 1902 the general economy continued to show a steady upward trend. Railroad and industrial stock prices generally, however, declined severely from October to December 1902, primarily as a consequence of tightening of credit for stock market operations. In October, November and particularly December of 1902, conditions on the New York Stock Exchange reached a point in this decline approaching panic and certain banks formed a $50,000,000 pool to support the market. In the latter part of December 1902, there was an upturn in stock prices that lasted until February 1903; then the market resumed a steep decline that continued until late in 1903 and corresponded generally with the depression of 1903-1904. The price of plaintiff’s stock did not share in the general rise of stock prices during the latter part of December 1902.
35. Before July 1907, when the recapitalization plan became effective, the stock market had been declining sharply for about ten months except for a short upturn in June. This decline was resumed in July and continued until stock prices reached a low point late in the fall of 1907. In December 1907, however, stock prices generally, including railroad stocks, were rising.
The general economy of the United States, after several years of relative stability, began a gradual decline in July of 1907 which steepened sharply in October and toward the end of the year, reached a low level at which it continued for about six months before business conditions began to improve.
PACTS RELATING TO THE POUR COMPANIES MOST COMPARABLE TO PLAINTIFF IN 1902
36. The four companies which plaintiff and defendant agree were not only comparable but also those most comparable to plaintiff in 1902 in terms of customers, products, *250 capital structure and type of organization were American Car & Foundry Co., American Locomotive Co., Pressed Steel Car Co., and Barney & Smith Car Co., each of which is briefly described immediately hereafter.
(a) American Car & Foundry Co., incorporated February 20,1899, was a consolidation of companies for the manufacture of railway cars of all types, classes and construction, railway supplies, cast iron water pipes, car wheels, merchant bar iron, pig iron, castings, forgings, interior woodwork, car floats, repair parts and various other articles of miscellaneous character.
(b) American Locomotive Co., incorporated June 10, 1901, in New York, was a consolidation of sixteen railway locomotive manufacturing companies. Its principal products were locomotives. Plows, dredges and steam shovels were also produced at the time of or shortly after incorporation.
(c) Pressed Steel Car Co. was incorporated in New Jersey on January 12, 1899, as a consolidation of two companies engaged in the manufacture of steel passenger and freight cars, trucks, bolsters, steel truck frames and certain pressed steel specialties for wooden and steel cars.
(d) Barney & Smith Car Co. was incorporated in West Virginia, May 31,1892, as the successor of Barney & Smith Manufacturing Co. The new corporation was engaged in the manufacture of all classes of freight and passenger cars, car trucks and appliances and electric and street railway cars.
37. The earnings, total market price of stock, and price-earnings ratios of the four companies most comparable to plaintiff in 1902 are as follows:

The average of the price-earnings ratios of the four companies most comparable to the plaintiff in 1902 is 9.79 for the latest year and 9.76 for the latest two years.
*251 Findings of Fact
38.The book net worth, the total market price of stock, and the percentage of the latter to the former for the four companies most comparable to the plaintiff in 1902, the average of such percentages for the first three companies, and the average of such percentages for all four companies are as follows:

GENERAL DESCRIPTION OF THE OPINION EVIDENCE
39. Both plaintiff and defendant introduced opinions of qualified experts based upon the facts summarized in the foregoing findings. Such opinion evidence was designed:
(a) to establish the value of the plaintiff’s original equity invested capital in accordance with varying theories — at an amount in the neighborhood of $18,500,-000, according to the plaintiff’s experts — at approximately $14,000,000, according to the defendant’s experts; and
(b) to disparage the opinions advanced on behalf of the other party as well as the factual bases for the other’s opinions.
40. The stock of plaintiff had no established market value as of July 23, 1902, and there is no basis in the record for a finding of the value of plaintiff’s equity invested capital based on the market value of the stock on that date.
41. Defendant’s expert witness, Ollsen, and plaintiff’s expert witnesses, Blattner and Emerson, are each qualified to express opinions concerning the valuation of plaintiff’s equity invested capital that merit serious consideration in reaching a decision on such valuation.
SUMMARY OF PLAINTIFF’S VALUATION EVIDENCE
42. The plaintiff’s opinion evidence seeks to sustain a valuation of $18,500,000 on the following bases:
*252 (a) The Gary Recapitalization.
That $17,184,000, the par value of the capital stock issued in the Gary recapitalization of 1907, adjusted to $18,481,-887.75 to take account of agreed amounts of capital distributions, capital additions, and earnings between July 23, 1902, and July 31, 1907, reflects a nearly contemporaneous determination of the amount of plaintiff’s original equity invested capital that is sufficiently reliable to sustain a finding in this case that $18,481,887.75 is the fair value of plaintiff’s original equity invested capital.
(b) The Price-Earnings Ratio Method.
That the amounts of $18,501,142 and $18,444,448 that result from multiplying the annual rate of earnings of $1,889,800 reported for plaintiff in 1902 by Jones, Caesar & Co. by price-earnings ratios of 9.79 and 9.76, derived by averaging the price-earnings ratios of the four companies then most comparable to plaintiff for the latest year and the latest two years before the valuation date, represent reliable approximations of the value of plaintiff’s equity invested capital as of July 23, 1902, that tend to confirm the correctness of the similar valuations reached by other methods.
(c) Percentage of Booh Net Worth.
That the figure of $18,510,450 that results from multiplying the plaintiff’s book net worth on July 23,1902 ($30,500,000) by the average of percentage relationships (60.69) between the total market price of the stock of three of the four companies most comparable to plaintiff in 1902 and the book net worth of those companies
($30,500,000 X 60.69=$18,510,450)
tends to confirm the similar valuations reached by other methods.
(d) Valuation Based on Trading in Fractional Shares.
That the figure of $18,558,750 that results from:
(1) multiplying the total number of plaintiff’s outstanding preferred shares (155,000) by the pegged price of $85 per share at which fractional shares of the preferred were traded between November 24,1902, and February 1904
(155,000 X$85=$13,175,000) ;
*253 (2) multiplying the total number of plaintiff’s outstanding common shares (150,000) by the pegged price of $30 per share at which fractional shares of the common were traded during the same period
(150,000 X$30=$4,500,000);
(3) adding the products of these calculations
($13,175,000 plus $4,500,000=$17,675,000); and
(4) adding five percent of the total ($883,750) as an allowance for fractional share trading and broker’s commissions
($17,675,000 plus $883,750=$18,558,750)
represents a nearly contemporaneous valuation based on prices in trading transactions between willing buyers and willing sellers that tends to confirm the similar valuations reached by other methods.
(e) Prior Internal Revenue Determinations.
That the repeated prior acceptance and allowance by officials of the Internal Kevenue Service of $17,184,000 as the value of plaintiff’s properties as of July 31, 1907, constitute determinations made by responsible officials, presumably on the basis of adequate evidence, many years nearer the event than the present valuation, and, accordingly, are entitled to substantial weight as evidence of the correctness of the valuations advocated by the plaintiff, even though they are not legally binding and are not buttressed by evidence that such prior determinations were based on independent valuations.
SUMMARY 03? DEFENDANT’S VALUATION EVIDENCE
43. (a) The Valuation on Which the Contested Tax was Based.
Evidence offered by the defendant shows that the valuation of $12,675,000, the contested element of the computation of the tax which plaintiff now seeks to recover, was arrived at by multiplying the number of plaintiff’s shares by the average price at which such shares were traded on the New York Stock Exchange for the week ended December 5, 1902. Defendant offered no evidence to sustain the propriety of this basis for valuation or the correctness or fairness of the resultant figure. On the whole record we find that $12,676,000 *254 does not fairly or correctly represent tbe value of plaintiff’s original equity paid-in capital.
(b) Valuation Based on Adjusted 1902 Trading Prices for Plaintiff’s Stock
Defendant’s expert fixed tbe value of plaintiff’s original equity paid-in capital at $14,000,000. Tbis figure be derived by:
(1) multiplying tbe price of tbe first sale of plaintiff’s preferred stock over the counter on November 22, 1902 (100 shares at 7414) by tbe total number of shares of such preferred (155,000)
(74.50 X155,000=$11,547,500);
(2) multiplying tbe price of 14% at which 57 shares of plaintiff’s common stock sold on December 5, 1902, by 110 percent to reflect the fact that tbe prices of tbe common stocks of tbe four companies then most comparable to tbe plaintiff were 10 percent higher on July 23, 1902, than their average price for tbe week of December 5,1902
(14.75X1.10=16.225)
and rounding tbis figure upward to 16.25, the nearest trading price;
(3) multiplying tbe resultant figure (16.25) by tbe number of plaintiff’s common shares (150,000)
($16.25 X150,000=$2,437,500) ;
(4) adding tbe results reached by tbe computations described in (1), (2) and (3)
($11,547,500 plus $2,437,500=$13,985,000);
(5) rounding tbe result reached in (4) upward by $15,000 to the next highest million dollars
($13,985,000 plus $15,000=$14,000,000).
ANALYSIS OE DEEENDANT’s VALUATION EVIDENCE
44. Fundamentally Ollsen’s opinion that the value of plaintiff’s equity invested capital was $14,000,000 as of July 23, 1902, is based on tbe prices realized on the one first sale of 100 shares of plaintiff’s preferred stock on November 22, *255 1902, and on the sale of only 57 shares of plaintiff’s common stock on December 5,1902, the first day when such stock was traded. In each case the trades occurred about four months after the date when such stock was exchanged for the properties to be valued. In the case of the common stock the actual price was adjusted upward by 10 percent to reflect the fact that the common stock of the four companies then most comparable to plaintiff had declined by 10 percent between July 1902 and December 5,1902.
45. The computation described in finding 43 represents an effort by a competent expert to reach a valuation by application, to the extent this record permits, of the generally accepted theory that the value of corporate properties may be fairly measured by the fair market value of the securities or other considerations exchanged for them as of the valuation date.
46. The theory described in finding 45 is commonly considered valid and appropriate where the prices realized on the security sales relied upon as the measure of value can reasonably be regarded as reflecting a contemporaneous general public evaluation of the properties represented by the securities traded.
47. The validity and appropriateness of the theory described in finding 45 lessens to the extent that factors exist which prevent the particular market prices relied upon from reflecting a broad, contemporaneous consensus among persons trading in the securities concerning the value of the properties the securities represent.
48. Factors of the kind mentioned in finding 47 are present in this case.
(a) The number of shares involved in the transactions relied upon to establish the value is very small. So, also, is the number of transactions. The sampling of public appraisals of value is correspondingly narrow. Prices for 100 shares in one transaction in the case of the preferred and for 57 shares on the first day of trading in the case of the common can scarcely be regarded as reflecting a broad, general agreement among members of the trading public on the value of plaintiff’s enterprise. It does not help this valuation to say, as defendant’s witness does, that if the price on *256 the stock exchange one day does not reflect fair market value, it will change within a few days to a price that does. The prices relied upon here are neither averages of many transactions over an extended period nor prices typical of an established market or trend. They are prices for one day for a very small number of transactions involving a very small amount of stock. Moreover, the trading for months following was light and took place in a market affected by the complex of forces that caused the 1903 depression. As a consequence, the reliability of such subsequent trades as a basis for measuring, retrospectively, the value of plaintiff’s properties in July 1902 is dubious at best.
(b) The prices relied upon as the basis of defendant’s valuation are the prices paid on the first trades in a green security, newly issued on the Exchange and relatively unknown to the investing public. The reliability of prices in such trades as a basic guide to value of the corporate properties is substantially less than would be prices in current trading in a security well known to the investing public and having an established market. As defendant’s witness points out in his report, these prices might possibly have been influenced upward by the fact that the balance sheet filed with the plaintiff’s listing application was optimistic by $500,000 through an inadvertent duplication in its representation of the cash available. That is pure conjecture; but it is possible. In the same way, any or many of innumerable other mistaken first impressions might similarly cause the price realized in a single first sale of a new security to deviate up or down from a price that would genuinely reflect an informed appraisal of the value of the corporate properties represented by the stock.
(c) The stock prices relied upon by the defendant, although the first available after the exchange of the stock for the property to be valued, were paid in trades made four months after the valuation date. This lack of contemporane-ousness alone would not necessarily dissipate the value of such prices as an index of property values if it were clear that the conditions and relationships that prevailed on July 23, 1902, continued substantially unchanged through November and December of that year.
*257 The record shows the contrary. In July 1902 general business was prosperous, had been prosperous for a year and a half, and continued prosperous throughout the latter half of 1902. Eailroad and industrial stock prices, however, declined sharply between October and the middle of December 1902, not because of adverse business trends but primarily because of restrictions on credit available for stock market operations. It seems plainly evident from the record that the relationship between stock prices and property values was substantially different in December 1902 from that which prevailed in July of that year.
49. The upward adjustment of 10 percent made by Ollsen in the price attributed to plaintiff’s common tends to ameliorate pro tanto in plaintiff’s favor the inadequacy of the facts in this record to implement the method he uses to reach his valuation of $14,000,000. The adequacy of the adjustment itself, however, is subject to serious uncertainties not resolved by the evidence.
At best the adjustment could compensate only for the lack of contemporaneousness. It does not correct the other deficiencies mentioned in finding 48.
Even as to its effect as a means of simulating contempora-neousness, the record affords no substantial basis for a finding that the behavior of plaintiff’s common stock, had it been traded first in July, would have paralleled the average behavior of the stocks of the four comparable companies. Although three of the four were relatively new companies, they had been established and operating for a year in one case, a year and a half in the case of two others, and ten years in the case of the fourth. There had been at least some opportunity for their properties and policies to become known and for them to establish a record of earnings and an informed market for their securities. These and other factors afforded a considerably more substantial basis for an informed public judgment as to a fair price for their securities than any plaintiff could have established in its first four months of operation. Whether plaintiff’s new securities would have behaved as theirs did in the declining market of the late summer and fall of 1902 is a pure guess. Comparable as they may have been with plaintiff in many respects, *258 it is far from clear on this record that the average prices of their common stocks in the fall of 1902 afford a fair or accurate measure for gauging, in reverse, in 1960, a hypothetical trend in the price of plaintiff’s common over a four-month period fifty-eight years ago.
A valuation based on figures and comparisons as conjectural as these affords no adequate basis for finding that $14,000,000 represents the fair value of plaintiff’s equity invested capital in July of 1902.
50. Substantial evidence in the record, not itself conclusive as to a precise valuation, strongly suggests that the correct valuation is higher than the $14,000,000 advocated by the defendant. For example:
(a) $14,000,000 is about 24 percent less than plaintiff’s proposed valuation of $18,500,000. A valuation of over $15,000,000, only about 18 percent less than plaintiff’s proposed valuation, would result according to the price-earnings ratio method (which defendant’s expert appears to agree is a sound method, if suitable earnings figures and comparatives are used), even applying the price-earnings ratios of the four admittedly comparable companies to plaintiff’s actual earnings during its first year of operations (which began when business prospects were good but ended during the 1903 depression).
(b) Until plaintiff filed its claims for refund in December of 1945, based on increased amortization deductions, the Internal Revenue Service at intervals over a period of twenty-five years had repeatedly accepted and allowed valuations claimed by plaintiff that were substantially equivalent to the valuation of $18,500,000 plaintiff claims here. As defendant says, the prior Internal Revenue determinations are not legally conclusive here, and there is no evidence that any of them was based on an independent valuation. On the other hand, it overstrains credulity to accept the implication defendant’s position suggests, that a succession of responsible officials of the Internal Revenue Service, in examining plaintiff’s returns in 1920 for several earlier years and again for the years 1940 through 1944, acting upon such evidence as they deemed necessary to satisfy themselves that the United States would receive for those years the amount of the tax it *259 was entitled to receive from the plaintiff, repeatedly overlooked or casually ignored an over-valuation as great as $4,500,000, almost one-fourtb of the amount plaintiff has always claimed, and nearly one-third of the amount defendant now says is the correct value of plaintiff’s original equity.
Less frequent acceptance of a substantially lesser difference might perhaps be regarded as resulting from a succession of administrative oversights or a consistent view prior to 1945 that the difference was not worth the cost and trouble required to prove it. But the fact that the Internal Revenue Service repeatedly accepted plaintiff’s valuation forty years nearer the event and again between fifteen and twenty years nearer the event than the decision now required creates at least a strong inference that any difference between the value plaintiff claims and the true value of its original equity invested capital is by no means as great as the $4,500,000 difference between what plaintiff claims and the $14,000,000 valuation now advocated by the defendant.
51. For the foregoing reasons, we find that $14,000,000 does not fairly or correctly represent the value of plaintiff’s original equity invested capital.
ANALYSIS OE PLAINTIKf’s VALUATION EVIDENCE
Price — Book Value Method
52. Experts testifying for both parties agree, and we find, that book values are entitled to little weight in determining the going concern value of the properties of an active business. Accordingly, it is not necessary to accept defendant’s criticism of the capital stock item in plaintiff’s opening balance sheet as a measure of property values in order to conclude that, for the purposes of the decision required here, little reliance can be placed on the result of applying to that amount the ratio between the stock market price and the book net worth of three of the four companies most comparable to plaintiff in 1902. That computation affords no adequate independent basis for a finding that the resultant figure of $18,510,450 is the value of plaintiff’s original equity invested capital and gives no more than a hint towards confirmation of the validity of similar figures arrived at by other methods of valuation.

*260
Trading in Fractional Shares

53. The fact that fractional share trading was authorized at $85 per full share for the preferred and $30 per full share for the common and that fractional shares were traded at those prices for eighteen months or so after November 1902 adds but little weight to the other evidence offered to show a valuation in the neighborhood of $18,500,000.
(a) The fact that brokers were authorized to trade fractional shares at those prices reflects a determination by some unidentified persons in plaintiff’s management that such prices were appropriate for such trading. The record does not show who made that determination, how it was made, or the extent to which it represented a considered judgment concerning value, or an appraisal of market factors having only incidental relation to value.
(b) Even though the prices were pegged, the trades made at those prices represent transactions between willing sellers and willing buyers, agreeable to acquiring or disposing of parts of shares at those prices. But the mere fact that such trades occurred over an extended period does not show a firm public consensus that such prices represent the going concern value of the property. The record contains no indication that the volume of such trading was adequate to indicate more than a scattered smattering of individual judgments to buy or sell. An almost infinite variety of considerations may affect the prices paid in individual sales or purchases of stock. This is true especially of sales or purchases made for the purpose of matching up into full shares the fractional odds and ends left over in an exchange transaction. Such trading can scarcely be regarded as a concerted public appraisal of the going concern value of the enterprise.
(c) Some trades in fractional shares occurred when the contemporaneous prices for full shares on the Exchange were widely different from the fixed prices for fractional shares. This suggests that the factors motivating trades in fractional shares were different from those considered by the general run of public buyers and sellers in arriving at the prices paid on the Exchange for full shares and that one or the other, or perhaps both, cannot be relied upon as a measure of the value of the corporate properties.
*261 (d) For the foregoing reasons, the prices realized in the trading in fractional shares cannot be regarded as affording an adequate independent basis for finding that the value of plaintiff’s original equity invested capital was $18,558,750 or as lending more than a modicum of confirmatory support to comparable valuations reached by other methods.

The Gary Recapitalization

54. In recommending in January 1908 the recapitalization plan described in findings 26 through 31, the special committee of directors determined that, as of July 31, 1907, the plaintiff’s properties were worth, in their judgment, not less than $17,184,000, the total par value of the stock to be issued pursuant to the plan. This was equivalent to a determination that, in their judgment, the plaintiff’s original equity invested capital on July 23, 1902, had been $18,481,887.75. (See findings 23-25 and 42(a).)
(a) Defendant’s expert witness questioned the reliability of the valuation made by the directors in connection with the Gary recapitalization on the grounds that, because it was a self-appraisal by members of the plaintiff’s management, it did not result from the sort of arm’s-length bargaining that would have occurred in negotiation of a merger, a sale for cash, or some other transaction with outsiders; that it was measured by the par value of securities, and that when the new securities issued in the recapitalization were traded, beginning in a rising market almost a year after the effective date of the plan, the aggregate public valuation, measured by market prices for both stock and debentures, plus the cash distributed, failed to confirm the judgment of the special committee — amounting to only about $9,350,000, little more than half the committee’s valuation of the stock alone and almost $5,000,000 less than the valuation advocated here by the defendant’s expert.
(b) No one apparently contends that the $9,350,000 figure, based on trading in the securities of the recapitalized company six years or more after July 23, 1902, should be considered as a direct measure of the July 1902 value of plaintiff’s equity. The evidence in the record affords no adequate basis for appraising its true significance even as a basis for *262 criticism of tbe valuation that formed the measure of the 1907 recapitalization.
(c) The fact that the valuation implicit in the recapitalization is measured by the par value of the stock issued is not derogatory to its correctness if the directors achieved their stated objective of reducing the par value of the stock to equivalence with the value of the equity it represented. The real question is whether the directors’ judgment was sound.
(d) There were powerful compulsions on the members of the committee to arrive at a reasonable approximation of the correct value. In devising the plan they were primarily activated by demands that they authorize dividends. They professed to have, and probably did have, genuine concern about the threat of litigation that might subject them to personal liability if dividends were paid and the approximate correctness of the valuation adopted could not be defended in court.
(e) The recapitalization did lack the sort of arm’s-length bargaining which, in negotiations leading to a cash sale or a merger or some other transaction with adversary interests, tends to insure that the final price is right. Theoretically such bargaining ultimately leads to agreement on a figure that represents true value. The theory is probably sound if the results of a substantial number of transactions are averaged out. But it is not necessarily so in any one transaction. Many factors affect the price at which properties are sold or exchanged between adversary interests. The mere fact that the bargaining is at arm’s-length does not assure that one of the adversaries does not get the better of the bargaining from the viewpoint of sheer dollar value.
(f) Moreover, such neutral objectivity as Judge Gary may have derived from the even division of his interests was probably supplemented by a measure of arm’s-length bargaining arising from conflicts in the personal interests of other members of the committee, some of whom held common stock while others held preferred. It is impossible, however, to determine from the record the extent to which considerations of corporate politics, considerations concerning the marketability of the particular types and amounts of new securities, and various other factors collateral to the *263 basic determination of value may have affected the committee’s recommendation.
(g) On the whole record it seems that the committee’s recommendation represents a conscientious effort by a group of competent persons with balanced interests to fix the true value of the plaintiff’s equity capital as of July 31, 1907. The result merits serious consideration, along with other evidence, as an indication of the range within which that value may be found. It cannot, however, be accepted as independently conclusive in this case as a basis for a specific finding that the value fixed by the directors was correct. It shares with other methods based on only a few transactions or on one individual transaction the fault that it reflects the judgment of only a limited number of individuals, exercised in circumstances, the effect of which on the objectivity of the judgment and the correctness of the result cannot be gauged precisely. In this respect it differs from a broad general consensus of the sort reflected by contemporaneous prices in an active public market where, generally speaking, idiosyncrasies of particular cases are likely to be washed out. No contemporaneous public market is available here for comparison, but other facts pertinent to the determination of value by the price-earnings method suggest that the valuation made by the directors in connection with the Gary recapitalization may have been over-optimistic.

The Price-Earnings Ratio Method

55. The price-earnings ratio method is a generally accepted method of valuation where, as in this case, there are no market quotations for the plaintiff’s stock at or near the valuation date.
56. The four companies most comparable to plaintiff in 1902 that are described in finding 36 are good comparatives for the purpose of applying the price-earnings ratio method in this case.
57. A fair and reasonable approximation of the value of plaintiff’s equity invested capital as of July 23,1902, may be determined by multiplying the average of the latest price-earnings ratios of the four companies then most comparable to plaintiff by a figure that fairly reflects the approximate an *264 nual rate of earnings plaintiff reasonably might have anticipated as of July 23,1902.
58. In the relatively favorable economic climate of July 1902 plaintiff reasonably might have anticipated an annual rate of earnings greater than the $1,538,703.21 it actually earned during its first year of operations, which extended into the 1903 depression.
59. For reasons hereafter stated in findings 60 through 64, the evidence in this record does not sustain the earnings rate of $1,889,800 assumed by plaintiff’s expert witness in computing plaintiff’s proposed valuations of $18,501,142 and $18,444,448 but does afford a reasonable basis for finding that, as of July 23, 1902, plaintiff reasonably might have anticipated an annual rate of earnings slightly exceeding $1,700,000.
60. The fact that the $1,889,800 earnings rate assumed by plaintiff’s expert was essentially a pro forma estimate, based on records of past earnings for relatively short periods, annualized and subjected to various adjustments does not, in itself, disqualify it for use in comparison with the earnings of the four comparable companies for the purpose of the determination required in this case. Any earnings figure is useful in appraising the going value of a business only to the extent that it affords a basis for reasonable prophesy as to the earnings likely to be realized in the future. A consistent record of past earnings over an extended period is generally accepted as a strong evidentiary buttress to the expectation that earnings are likely to continue at an approximately similar rate, provided nothing interferes. So it is here in the case of the comparable companies. But an extended record of past earnings, standing alone, carries no absolute guarantee that the earnings stated will continue. Nor does the absence of an extended record of past earnings in itself invalidate, as a comparative, an estimate of earnings that is based on other reasonable grounds. The real question is whether the estimates to be compared are sufficiently soundly based to support a reasonable expectation that the earnings stated will be realized. The following findings relate to that question.
*265 61. There is no evidence that defendant’s expert witness had any information about the Sargent Company that would afford him a factual basis for an informed opinion as to what its costs or earnings were. The fact that, in 1902, reputable accountants, recognizing a responsibility to exercise independent judgment in appraising the reasonableness of adjustments made in preparing their earnings report, accepted as reasonable the estimate of corporate officials that the net earnings of that company were $66,800 is more persuasive evidence than Ollsen’s off-hand opinion 56 years later that the figure seemed “quite high.” The record affords no adequate basis for rejecting that amount as an element of the plaintiff’s assumed annual rate of earnings.
62. The accountants concurred with a specific judgment of the responsible corporate officers in adding back $150,000 to the earnings of American Steel Castings Company to compensate for that part of a decrease in its two-year average earnings which its officers attributed to non-recurring strikes. There is no evidence in the record to support a conclusion that this specific contemporaneous estimate was overgenerous.
63. It appears from the record that at least $12,000, probably $44,000, and perhaps all of the $48,000 added to the earnings of American Steel Foundries Company to compensate for losses attributed to a strike that stopped that company’s operations during part of only one month of the nine-month period for which its actual earnings were taken, was an erroneous addition. $12,000 of the $48,000 added back appears to have been derived by adding $4,000 a month for three months in annualizing a nine-month figure of $36,000 attributed to that strike. If the same process was used in getting the nine-month figure as was followed in expanding it to an annualized figure, the basic non-recurring loss that actually occurred was not more than $4,000. (See finding 20(h).)
In view of the confused and inconclusive proof of the amount of the actual non-recurring loss from this source, the amount added back should be excluded from the earnings figure used in the valuation computation.
($1,889,800 minus $48,000=$1,841,800)
*266 64. The record does not show that accepted accounting practice in 1902 required that, in annualizing short-term earnings figures, any consideration should be given to the making of any adjustments in anticipation of possible losses from seasonal variations, strikes or other commonly experienced causes of earnings impairment where such impairments had failed to occur during the short periods for which actual earnings figures were taken.
It seems unrealistic now to assume that those of plaintiff’s component companies in which no shut-downs had occurred might be expected to continue indefinitely earning unmodified multiples of the amounts they had earned in the trouble-free months for which their earnings were taken. The making of a reasonable adjustment for this purpose would override no specific contemporary decision evident from the record.
Recognizing that losses of $198,000 were attributed to strikes, deemed non-recurrent, that did occur in two of the six companies, it is not unreasonable to assume that at least half that amount of losses might be anticipated annually from work stoppages in one or more of the six companies over any extended period of operations and for the purposes of the determination required in this case to deduct $100,000 from plaintiff’s estimated earnings as an adjustment for such anticipated losses.
($1,841,800 minus $100,000=$1,741,800)
65. Applying to the estimated earnings figure of $1,741,800, resulting from the adjustments described in findings 63 and 64, the price-earnings ratios of 9.79 and 9.76 based on performance of the four companies most comparable to plaintiff in 1902, results in valuations of $17,052,222 and $16,999,-968. Adjusted to eliminate the illusory exactness that is inconsistent with the essentially approximate character of any valuation of plaintiff’s original equity invested capital at this late date, these results indicate a valuation of $17,000,000.
66. A valuation of $17,000,000 is enough greater than the valuation of $15,000,000 that results by the price-earnings ratio method, using plaintiff’s actual earnings during its *267 first year of operations, to reflect, in reasonable measure, the differences between the expectations justified by the favorable business conditions of July 1902 and the earnings realized from actual operations during a year which extended some months into the 1903 depression.
67. A valuation of $17,000,000 is not so much less than the valuation plaintiff has always claimed as to make it altogether incredible that the Internal Revenue Service could have overlooked or ignored the difference for twenty-five years prior to 1945.
68. $17,000,000 is a reasonable approximation of the value of plaintiff’s equity invested capital as of July 23,1902.
CONCLUSION OE LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that the plaintiff is entitled to recover and judgment will be entered to that effect. The amount of recovery will be determined pursuant to Rule 38 (c).
In accordance with the opinion of the court and on a memorandum report of the commissioner as to the amounts due thereunder, it was ordered on September 8, 1961, that judgment for plaintiff be entered for $703,166.40, together with interest thereon as provided by law on the amounts and from the dates set forth in the stipulation filed by the parties on August 22, 1961.

 See 26 U.S.C. (1962 ed.) § 718.

 In determining plaintiff’s invested capital in 1920 for the purposes of the Revenue Acts of 1917 and 1918, the Commissioner of Internal Revenue had adopted and allowed the amount of $17,184,000, approved by the Committee on Appeals and Review, as the aggregate net value of plaintiff’s properties as of July 31, 1907. The record contains no evidence that the adoption and allowance of that amount as the aggregate net value of plaintiff’s properties was preceded by an independent valuation.

 This amount of $18,550,743.44 represents the amount of $17,184,000 adopted and allowed by the Commissioner of Internal Revenue as the aggregate value of plaintiff’s properties as of July 81, 1907, In determining the plaintiff’s invested capital under the Revenue Acts of 1917 and 1918, plus an adjustment for capital distributions made by plaintiff in the amount of $116,181.51, and plus $1,250,561.93 of accumulated earnings and profits.

 Apparently whatever loss was attributed to this shutdown (presumably $4,000) was multiplied to get a rate of loss estimated at $36,000 for the nine-month period and, in annualizing the nine-month earnings figure, this adjustment was increased by % to $48,000, which was taken as the annual estimated rate of non-recurring loss attributable to the January shut-down and added to the annualized earnings figure.